Thank you. May it please the court and counsel, on December 6th of 2012, Trooper Edgley with the Idaho State Police conducted what amounted to a pretextual stop of Mr. Hoffman's vehicle to carry out what was a general criminal investigation that the Idaho State Police was carrying with respect to a residence in Jefferson, or in Pocatello, Idaho, known as 710 Jefferson. Now, during that stop, Trooper Edgley departed from the normal traffic mission to carry out tasks unrelated to the traffic missions, and those were calls for a drug dog sniff and checks for the probation and prior criminal or prior drug convictions of both Mr. Hoffman and his passenger. These are, both of these tasks under the Rodriguez and Evans authority are tasks that are not related to the traffic mission in this instance, and if so, let me back up. After that, Trooper Edgley also conducted a Terry Frisk, which grossly exceeded the this Court's IEV decisions. Robert Adler As I understand it, the district judge did not have the benefit of Rodriguez and Evans, is that correct? So he was proceeding just on the state of the law at that time. Troy Adler And the state of the law at that time was largely based upon the Illinois v. Cabalas decision, which a lot of the decisions that had come out at that time looked at the aggregate time. In fact, the district judge here concludes at the end of his order that, what was it, 18 minutes? He says at the end, the overall length of time was not unreasonable. Robert Adler And Judge Piazza, what I believe you are referencing is in Judge Lauda's order, he did reference that he was unable to find any case law that held that an extension of as a matter of law. So he didn't do the analysis under Rodriguez and Evans because he didn't have the benefit, right? So let me ask you, I have a couple of questions for you and then you can zero in on what you think is important, but I just want to make sure I understand everything properly. As I understand Judge Lauda's order, he does note the circumstances of the other officer monitoring the house, right? Yes. And he acknowledges the phone call to Officer Edgley to make a stop if he could find a, if there was a traffic violation or something. Yes. And in his order, but in his order, the judge relies on a determination that the stop itself was on the basis of the traffic infractions. Yes. Is that correct? He doesn't rely, although he makes note of what happened, what was going on at the house, he doesn't rely on that as a basis for the stop. No. And Mr. Hoffman concedes that there was a valid basis for the traffic stop. Right. That being the traffic violations that were independently observed by Trooper Edgley. We're not contesting. Well, let me ask you this. The information that the officer at the house provided to Edgley, did that provide a reasonable basis to stop? No. Why not? The only information they had at that time was that Mr. Hoffman had been observed at this house. They don't know what Mr. Hoffman had done inside. When you say they, are you talking about Kemp or Edgley? I say they being collectively law enforcement. Sergeant Kemp and Trooper Edgley. And I would concede that under the collective knowledge doctrine, they can rely upon the information that they independently possess. But at that point, all that law enforcement knew was 710 Jefferson had been reported as being a suspected drug house. Wasn't there a couple of months before a drug buy? There was a controlled buy that had been carried out by Idaho State Police, according to Sergeant Kemp. And there had been several stops of individuals who had been like Mr. Hoffman at the house, but none had resulted in arrests. And on December 6th, they didn't know Mr. Hoffman. They didn't know who the passenger was. All they had known was that just like, say, the postman, he had been observed at the front door. Is that sufficient? So no reasonable suspicion that Hoffman conducted a drug buy, but reasonable suspicion for the traffic stop? Sorry, I didn't quite hear you. There was reasonable suspicion for the traffic stop, but not for drug activity by Hoffman? Yes. There's no dispute that there was reasonable suspicion for the traffic stop. I would dispute that they had independent reasonable suspicion to detain Mr. Hoffman based upon his observation at 710 Jefferson, standing alone, had they not observed a traffic violation. And the prolongation of the stop itself under Rodriguez, as you acknowledged from Judge Pizer's question, wasn't really fully analyzed in light of the Rodriguez decision. So what do you suggest? Do we have enough here in this record to decide and remand, or if we decide to reverse and render, or should we remand? Well, I believe based on the record that's before the court, this court does have enough under this de novo review to make a determination of whether, under Rodriguez and Evans, the inquiry becomes if the court acknowledges that the traffic stop was, the mission was departed from to carry out these tasks unrelated to the traffic mission, such as for the dog sniff and the search of the drug. Well, I understand when he first, the first, when he called for the dog, it was when he was doing his check, right? His records check. So he also called for a dog. So why was that any prolongation? He just called for the dog, called for the dog. Because. Why can't you do multiple things, you know? Check this, call for the dog, wait for it to come back. You're still going to have to wait for the information to come back on the records check. Well, the record below is that the trooper actually acknowledges that almost immediately when he gets to his car, he calls for the drug dog. And both of these calls take a minute. Now, what he didn't do is call in, you know, a warrants check, a driver's license records check. And had he done so and he was waiting for the, those calls or those checks to come back and he had this, this free time, then yes, under Rodriguez. So what was the order? How do we know that he didn't do that? Was there a finding by Judge Lodge that he didn't, he didn't make the call first? There is not a finding on that matter. Well, that might be significant, right? Counsel, I have a question for you. The part of your side of the case that concerned me, that is, there's clearly cause for the stop because of the traffic violation. And I think I watched that video from the dash cam. And once the officer started to ask a question or two, there was very suspicious behavior by, by your client. So it seems to me if it was okay for the police to start to question him, then they probably had cause to go further. The question in my mind was, did they have the ability to ask him any questions? During a traffic stop, yes, you have the ability or law enforcement has the ability to ask questions that can't, those questions though can't be aimed at general criminal investigation. You know, just to follow up on Judge Gould's question, you know, even though they stop for one purpose, during the course of the stop, if things occur, reasonable suspicion might arise at that point, you know, later on in the investigation. So during the investigation when he's acting a little nervous and whatnot, as they say in the record, did that provide reasonable suspicion to go beyond the basic traffic stop? Well, nervous behavior standing alone is insufficient to give law enforcement reasonable suspicion to carry out. How about the movement of his hands? I think the movement of your hands you're referring to occurred very later in the stop when, 18 minutes later when he's asked to exit. And that would not give the officer reasonable suspicion to carry out these tasks unrelated to traffic mission because those occurred very early in the traffic stop. You have to look at what had happened prior to those prolongations. And I see my time is expiring. I'm not sure Judge Gould will let you continue on, but I have one other question for you before you sit down. Yes. Which is you made a reference to the Terry Frisk. Yes. What was wrong with that? Well, one, Mr. Hoffman disputes that Trooper Edgeley had a basis to suspect that Mr. Hoffman was armed and dangerous, and two, that this two-minute frisk exceeded the scope under the Dickerson and this Court's IEV decision, and that is you can conduct a brief frisk to determine if the suspect is armed or dangerous, but if you don't, if the officer is unable to detect something that they suspect to be possibly a weapon, then that's when the search ends. Haven't there been cases, though, that allowed that type of Terry Frisk when the officer suspects some criminality in the conducting of the frisk? And shouldn't we give some deference in that regard if it's reasonable? I mean, even cases where something soft was felt, for instance. Well, but the officer would have to reasonably suspect that it could possibly be a weapon under IEV, this Court's United States v. IEV decision, or even the Minnesota v. Dickerson decision announced by the Supreme Court. And in this case, the record, there's nothing in the record from Trooper Edgeley stating that he reasonably suspected that anything that he physically detected in Mr. Hoffman's pockets could possibly be a weapon. And that was something that would need to be in the record to justify that further intrusive manipulation of his pockets. Okay, counsel, your time is up, but we took it up with our questions. So we'll give you an extra two minutes. Could you put two minutes on the clock for our rebuttal? May it please the Court, counsel. My name is Mike Fica. I'm an assistant United States attorney in Idaho. I was also the prosecutor initially in this case who charged the case and argued the case on the suppression motion. Your Honor, as the Court has inquired with my colleague, there are really two issues here for the Court's determination, and I'd like to address both in turn. One is whether there was — whether the district court was correct in finding a continuation of the stop of Mr. Hoffman was based upon additional reasonable suspicion that just — He didn't really make that finding, though, did he? Your Honor, I — Because he didn't have the advantage of Rodriguez or Evans. He did not have the advantage of Rodriguez or Evans, but, Your Honor, I respectfully disagree and suggest that he didn't essentially make the Rodriguez analysis. And, Your Honor, I point to the district court's decision on page 5. Page 5. The last sentence of the first paragraph of page 5 where the district court says, and I quote, the court finds additional questioning by Trooper Edgeley after informing Hoffman he was not going to give him a ticket was relevant to the officer determining his suspicions of ongoing criminal drug activity, which is exactly what Rodriguez suggests the officer needs to do. Well, what was the — let me see. The court finds the additional questioning by Edgeley. So that — so he's saying — what is he saying there? That then it was okay to what? Well, essentially what the court is saying is then it was okay to extend questioning and extend the stop beyond that of a routine traffic stop. Wait a minute. Where were you in this point of his analysis? We're at — right at the — Your Honor, I apologize. He's going through — Edgeley gives the response to his question, right? Correct. And essentially the facts of the case at this point, at this moment in time are these. He had seen, again, officers. But, you know, he does make — I found this kind of interesting because he does make reference to what was happening at the house and the information that Edgeley got, the tip about what was going on at the house. And to stop Edgeley but find some independent traffic violation to do it, don't rely on this. And the judge makes note of that, and I was reading it and I thought he was going to conclude that there was reasonable suspicion for the stop based upon the information that Edgeley — that Kemp provided him — Kemp provided, but instead the judge finds reasonable suspicion based upon the traffic stop. For the initial stop, Your Honor. But it seems like Judge Lodge was sort of taking all of that into consideration. And quite frankly, I think, Your Honor, that Judge Lodge was on track. Essentially he was doing the Rodriguez analysis without the benefit of Rodriguez. He found that the initial stop was justified based on the traffic violation. Right. But then he goes on in his decision to point out — and I'd like to point out the facts and then note his final sentence here. He goes on to note and he notes, makes factual findings that they left the Jefferson address where there was known drug activity in the past, whereas Sergeant Kemp testified Hoffman's behavior in going in, staying for 10 minutes, and coming out was suspicious. But beyond that, he notes that at the initial contact with Mr. Hoffman, where even if you were to set the Jefferson facts aside, the Jefferson House facts aside, at the initial contact with Mr. Hoffman, there was additional suspicious activity. Trooper Edgeway asked Mr. Hoffman, where are you coming from? And the district court notes all this in its decision. He asked Mr. Hoffman, where are you coming from? Mr. Hoffman says, well, I live up in Idaho Falls. He asked Mr. Hoffman's address up in Idaho Falls, which is wholly appropriate given the routine traffic stop at this point that the district fines were into. And Mr. Hoffman says, I don't know my address. I can't remember my address. Well, he said he was moving, right? He said he was moving, but he couldn't remember his address. And again, plausible, but adding to the suspicion at that point. And also a reference to the ownership of the car. Correct, Your Honor. But again, is that reasonable suspicion to suspect drug activity or a need for further investigation? I think, Your Honor, he'd left. It's the totality of the circumstances at that point for reasonable suspicion. The officers that observed him had a known drug location for only ten minutes, late at night, leaving that location. He was evasive in his answers. Instead of saying where he had come from, his answer was, well, I live up. Well, you know, that's not an unreasonable response. I didn't find his response so ridiculous. Not in and of itself, but again, in the totality of the circumstances, coupled with the fact that he's driving another person's car, coupled with the fact that he can't give his address in Idaho Falls, coupled with the effect that he's a bit evasive, coupled with all these. And the court recognized all these factors. During the time that it took to, say, do the records check or what have you, at what point did he check on, say, the ownership of the car issue? The timing was that he called in the records check on the two individuals in the car. He'd also called to check the registration on the car. It was during that interim time. As well as at that time calling for the canine dog? He called for the canine dog, and he'd been told that there were no canine dogs available even before the initial check of the driver, passenger, and registration. So after doing all that, he kept them for an additional period of time, right? Another, what, ten minutes or so? Correct. But at that point, Your Honor, a couple things have now happened. One is he's learned that the passenger is likely on probation and likely in violation of his probation. What does that mean, likely? Well, he hadn't confirmed that with the probation office, but the initial indication from dispatch was that the passenger was on probation and thus in violation of his probation. So at that point, when the return comes back, he's got even more information. He knows that the passenger is on probation and likely in violation of his probation, and he's yet to follow up on the initial ---- Did the district judge use that fact in analyzing the prolonged period of time here? He did, Your Honor, in his decision. That was one of the ---- Well, where did he make a separate determination that there was reasonable suspicion at that time to continue on? Your Honor, at the end of the decision, at page 5, or I'm sorry, two points. Your Honor, at page 4, with regard to the first paragraph where he's analyzing additional questioning by Trooper Edgeley, the district court, and I quote, says, the court agrees with the government that Trooper Edgeley's initial approach to the vehicle and continued questioning of Hoffman and the passenger was proper investigatory questioning in response to the observed traffic violations, information from Kempf, and then the dispatch report on the passenger. Counsel, let me ask this, and this isn't on your side of the case, but why shouldn't we just vacate this and send it back to the district court to consider in light of Rodriguez and Evans? Because Rodriguez, I can see some ways to distinguish that because there the traffic stop was totally done and then they called for the dog. But Evans goes really far, I think, and that's a circuit precedent, goes very far along the lines that an appellant would argue. So why shouldn't the district court be able to assess in light of that? Well, Your Honor, I would suggest it would be the government's position for two reasons. One is it's my belief in reading Judge Lodge's decision that it's on several occasions he notes that there was sufficient evidence to constitute reasonable suspicion for additional questioning by Edgeley. So I would maintain, Your Honor, respectfully, that there was . . . Well, the arguments framed by counsel might be a little bit different. I understand. They'd be tailored to the framework that we now have under Rodriguez and Evans. And clearly Judge Lodge did not have the benefit of Rodriguez. No, he didn't. No, he didn't. I certainly acknowledge . . . Could you just, I know your time is running out, but could you address the pat-down? Absolutely, Your Honor. With regard to the pat-down, it would be the government's position that given the factors that came into play, there was a caution code by Mr. Hoffman. Mr. Hoffman was becoming more agitated. Trooper Edgeley testified that he kept putting his hands down where he couldn't see him. He'd asked Mr. Hoffman to exit the vehicle. When he did, Mr. Hoffman became even more agitated. Trooper Edgeley, when he asked him if I could pat you down, then Mr. Hoffman becomes aggressive, moves his jacket, says, do you see any blank weapons? What's aggressive about that? I mean, I watched the video and I failed to really see anything aggressive about that. Again, Your Honor, I think . . . I mean, he moves his jacket. In the totality, I think, for example, that coupled with his behavior, for example, at one point, and I think this goes to the second factor, and, Your Honor, I assume my time has expired. May I just conclude on this point and then make one final point as to the pat-down? We'll give you two minutes extra because we're giving that to your distinguished opponent. Thank you, Your Honor. Even as he pats him down on the outer surface, he asks on several occasions, he feels something, and he asks Mr. Hoffman, what is that? Mr. Hoffman's response is not that of a reasonable person. When he says, I'll reach in and grab it, he keeps telling Trooper Edgeley, I'll grab it for you, and Trooper Edgeley says, no, just tell me what it is. So I would suggest, Your Honor, maybe not in and of itself aggressive is probably a strong term, but it certainly is. How about hostile? We can go with hostile. Certainly beyond that of somebody who's, and in contrast, you'll note earlier in the tape, he asked Mr. S. Chief. Mr. S. Chief agrees, and if you'll note, the pat-down of Mr. S. Chief takes, I factored, maybe 10, 15 seconds. At some point didn't he tell Edgeley that everything was okay? Mr. Hoffman? Yeah. I mean, didn't Edgeley tell Hoffman everything was okay with him at some point? Everything was okay. He said he wasn't going to cite me. Yeah, he said he wasn't going to cite him. That's correct. Right. For the traffic violation. For the traffic violation. Why didn't he just tell him, okay, bye? Well, because clearly at that point, and again, Your Honor, if I may, I just want to finish with one point on that Terry frisk, but in response to Your Honor's question, I make no bones about the fact that the officers were looking at the larger question of whether or not . . . They were really looking for drugs. And I didn't deny that at the district court at the suppression hearing. If you look at the record on suppression, I acknowledge and conceded that right out of the chute. If I could make one final point with regard to the pat-down, I would note this, Your Honor, the drugs, any evidence seized, and I just think this is one final factor the court can consider, any evidence seized as a result of the pat-down was not seized until after Mr. Hoffman fled the scene and was arrested. So to that point, if you look at the pat-down issue in and of itself, it's when Mr. Hoffman flees, Trooper Edgeley has felt the front pocket and felt the lump and asked what it is, and it's at that point that Mr. Hoffman flees. So with regard to the methamphetamine that was used as evidence at trial, that was never taken out of his pocket until he'd fled the scene. Thank you for your additional time, Your Honor. I ask that the court affirm the district court's decision. Thank you. Thank you very much, counsel. Okay. Appellant gets some extra time here because the case is difficult. We've asked both sides a lot of questions. And I'd like to, I guess, return to the Terry Frisk issue. And, Judge Gold, I noticed that you characterized Mr. Hoffman's conduct as hostile. I would submit that his conduct was that of a frustrated person. We have Mr. Hoffman who's pulled over two minutes into the stop. He's told by Trooper Edgeley, I'm not going to cite you, I'm going to release you. Fast forward 16 minutes later after he's been told that, and he's asked to exit his car and stand in this parking lot and submit to this intrusive Terry Frisk in questioning, intrusive questioning. So I think it's entirely understandable that someone that had been told 16 minutes earlier that you're going to be cited or not going to be cited but released for this traffic stop, that someone in that position would be frustrated. Why am I still here? Why am I being detained? Why am I being subject to these repeated questions about what's in my pockets? Why am I being questioned about where I live? I'd be frustrated in that position. But wouldn't he still be under, I guess, a general expectation to comply with the officer's instructions? A hundred percent. But I would also note in this Court's decision, IEV, that the Court noted the fact that the officer had already completed a large portion of his investigation of the vehicle without facing any threatening behavior undermines the well-settled purpose of the Terry stop, which is to allow the officer to pursue his investigation without fear. And that's exactly what happened here. This investigation, or the stop, was 18 minutes into his life before he even asked Mr. Hoffman to exit his vehicle, and this is when Trooper Edgeley says that my client was hostile. Well, it's . . . So I understand you would like us to just reverse and say your client wins right now, but what would be wrong with sending it back to the district court to look at Evans and Rodriguez and give us his analysis in light of that law? I don't believe that that would be a wrong outcome or inappropriate, but I believe that there's also the independent argument that under this Terry frisk is ceded the scope and that under the exclusionary rule that everything should be suppressed. How do you respond to counsel's argument that when they felt on his chest the object and he asked what it was and then he splits and that's where the meth was, is in that little container on his chest, and they then discover the meth afterwards, after he runs? Well, but the . . . Or tries to run. The exclusionary rule is designed to deter police misconduct, and under Dickerson and IAV, Mr. Hoffman would submit that Trooper Edgeley did not have any basis to subject Mr. Hoffman to this intrusive frisk, and so what was found as a result of that unlawful deep frisk should be suppressed. Okay. So back to my earlier comment about this Terry frisk, Trooper Edgeley I think is important to keep in mind. Trooper Edgeley was the individual in control of the situation, and 18 minutes into the stop is when he finally asked my client to exit his vehicle, and there is . . . it becomes tense at that point, but it was because, I believe, Trooper Edgeley and my client became argumentative with each other, and keep in mind, Trooper Edgeley, he was the one in control of the situation. If he was . . . he should have, in that situation, toned things down, but for whatever reason, he decided, based upon my client's conduct, that he needed to conduct this extensive frisk, which I think only escalated the situation leading to what ultimately happened. I see my time has expired, and I will submit this. Thank you. If there are no further questions from the panel, then this case, Mr. Hoffman's case, shall be submitted, and we thank both counsel for their nice arguments. I also must say, we thank you both for your travel to our courthouse. Thank you, Your Honor. It's a pleasure.
judges: Gould, Paez, Lemelle